UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHLEEN COLELLA-GRAHAM and CCG PARTNERS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>LIPPE TAYLOR GROUP, LLC, and CHEERPARTNERS LLC,<br><br>Defendants. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

THE PLAINTIFFS, Cathleen Colella-Graham and CCG Partners LLC state the following for their claims for relief against Defendants Lippe Taylor Group, LLC and CheerPartners LLC:

## THE PARTIES

1.      Plaintiff Cathleen Colella-Graham ("Cat") is an individual residing in Locust Valley, New York.

2.      Plaintiff CCG Partners LLC, f/k/a CheerPartners, LLC ("Cheer") is a domestic limited liability company formed on April 4, 2017, in the state of New York.

3.      Defendant Lippe Taylor Group, LLC is a New York limited liability company and Defendant CheerPartners LLC, f/k/a CP Acquirer, LLC ("CPA") is a New York limited liability company and a wholly owned subsidiary of LT.  LT operates through its direct and indirect wholly-owned and controlled subsidiaries, including CPA.  CPA does not operate independently and in its own interests, but serves solely to fulfill the purposes, goals, and policies of Defendant LT.  LT and CPA are collectively referred to herein as "LT."

## JURISDICTION AND VENUE

4.      Plaintiffs' claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"); the Americans with Disabilities Act, 42 U.S.C. Sections 12101, et.

seq., including the Americans with Disabilities Amendments Act of 2008 (together, the "ADA");

the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"); the

Fair Labor Standards Act 29 U.S.C. §§ 201 *et seq.*; the Equal Pay Act, 29 U.S.C. §§ 206(d) *et

seq.*; the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"); the

New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York

("NYCHRL"); New York Labor Law §§ 199, 194, 198 & 740 ("NYLL"); and New York

common law.

        5.      This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331

and 1334 as this action involves federal questions regarding the deprivation of Cat's rights under

federal law.

        6.      This Court has supplemental jurisdiction over Plaintiffs' related claims arising

under state and local law for violation of the NYSHRL, the NYCHRL, the NYLL, breach of

contract, and tortious interference, pursuant to 28 U.S.C. § 1367(a).

        7.      Upon information and belief, this Court has personal jurisdiction over all

Defendants pursuant to New York CPLR 301.

        8.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §

1391(b)(1) because defendants Lippe Taylor Group, LLC and CheerPartners LLC reside in the

Southern District of New York.  This dispute arises from the terms of, and transactions and

relationship contemplated by, the Asset Purchase Agreement, a contract in which Plaintiffs and

Defendants agreed to 'irrevocably submit to the exclusive jurisdiction of any state or federal

court located within the County of New York County in the State of New York for the purposes

of any suit, action, or other proceeding arising out of this Agreement or any transaction any such

action, suit or proceeding only in such courts." Thus, venue is also proper in this Court because Defendants consented to venue within the Southern District of New York.

## PROCEDURAL REQUIREMENTS

9.      On December 21, 2022, within 300 days of the acts of which she complains, Cat filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against Defendants, asserting claims of sex discrimination, age discrimination, disability discrimination, and retaliation.

10.     Cat's EEOC complaint (EEOC Charge Number 846-2023-03012) was cross-filed with the New York State Division of Human Rights and NYC Commission on Human Rights.

11.     On May 16, 2023, the EEOC issued Cat a Notice of Right to Sue and Cat filed this action within 90 days of receiving that Notice of Right to Sue.

12.     Any and all other prerequisites of the filings of this action have been met.

## FACTUAL BACKGROUND

### Cat Colella-Graham and Cheer

13.     Cat founded Cheer in 2017 as a full-service "Employee Experience™ agency."

14.     As an Employee Experience™ agency, Cheer provided its clients customized solutions for attracting, engaging, and inspiring employees.

15.     She did this by offering public relations and communications services to clients in several practice areas, including talent, human resources advisory, employee communications and diversity, equity and inclusion ("DEI").

16.     Cheer's mission was to change the way employees experience work.

17.     Prior to forming Cheer, Cat had worked in several human resources jobs for major employers, which experience provided the foundation for Cat's development of the concept of "Employee Experience™".

18.     Cat trademarked this term which was a shorthand expression that conveyed how companies could use customer brand loyalty strategies to retain employees.

19.     Cheer got off to a strong start and almost immediately began working with a number of high-profile clients.

20.     In the public relations and communications agency world in which Cheer operated, agencies typically obtain clients by responding to Requests for Proposals ("RFPs").

21.     Cheer, on the other hand, attracted clients completely outside of the RFP process.

22.     In March 2020, Provoke Media named Cheer the #1 fastest growing PR agency in the U.S. and the #2 fastest growing globally.

23.     Other early accolades for Cheer included:  Best Employee Engagement & Experience Agency-USA 2020, PR Week Best Places to Work Small Agency 2019, 2019 North American PR Agencies of the Year-Runner Up, Ragan's 2018 Employee Communications Awards-Content and Communications Finalist, and 2018 Bulldog Stars of PR Awards-Bronze Winner for Best New Agency.

24.     In 2019, Cat was awarded the Stars of PR Internal Communications Professional of the Year 2019-GOLD by the Bulldog PR Awards, which recognized that Cat "held C-suite level global roles for the last 10 years and has a track record of helping companies define their talent strategies to meet their corporate goals."

25.     In 2020, Cat was named one of PR News' Top Women in PR, and PR News recognized that Cat helped 81 PR professionals who were laid off during COVID-19 with their LinkedIn profiles, resumes, networking and video interviewing (free of charge)

26.     Since founding Cheer, Cat has served as a guest lecturer at Georgetown University and NYU, a Social Impact Awards juror, and a PRNEWS Platinum judge.

27.     Cheer was a small boutique firm by design.

28.     Cat did not want Cheer to have a big agency feel.

29.     However, Cheer's size in some ways meant limited opportunities for Cheer employees to have peers, build professional relationships, have reliable mentors, and be able to grow in their careers.

30.     When Cat started getting inquiries from various brokers about the possibility of selling Cheer, Cat saw an opportunity for her employees' career growth and for her to focus on client work.

31.     While Cat ended up with four offers to acquire Cheer, Cat ultimately decided to sell Cheer to LT.

32.     Cat's decision to accept LT's offer rather than the others was significantly influenced by LT's co-founder, Maureen Lippe.

33.     Cat first met Ms. Lippe in 2019 when both she and Cat served as panelists at PR Week's Hall of Femme, an event that recognizes women who have left a legacy for other women in the industry.

34.     Ms. Lippe's commitment to a women-forward business model was reflected by the fact that, at the time of LT's acquisition of the Cheer business, LT was a WBENC Certified Woman Owned Business.

35.     In addition to Lippe Taylor, Ms. Lippe is the founder of the SHEQUALITY Initiative which seeks to advance women into executive positions in the PR industry.

36.     Cat's interacted directly with Ms. Lippe prior to LT's acquisition of the Cheer business about LT's decision to acquire the business.

37.     While other employees performed the due diligence to support the acquisition, Ms. Lippe's interactions with Cat led Cat to believe that Ms. Lippe would have significant day-to-day involvement in the operations of Cheer as a separate division of LT, and that Cat could entrust Ms. Lippe with her career and her business.

*LT's Acquisition of Cheer's Assets*

38.     Cat signed an Asset Purchase Agreement ("APA") with LT on March 24, 2021 and LT's acquisition of Cheer's assets and business closed on that same date.

39.     Although LT did not acquire the Cheer entity, by acquiring its assets it was able to and did continue to operate Cheer's business as a separate business unit of LT (the "Cheer Business Unit") with Cat as its President.

40.     The acquisition was reported widely in New York's public relations industry, and in covering it, PR Newswire referred to Cat as "a longtime leader in the field of employee engagement."

41.     LT's CEO, Paul Dyer stated publicly that the acquisition happened because LT "realized that in order to offer the best support to our clients, we needed to take our capabilities to another level."

42.     The sale price for Cheer's assets had two components:  an upfront payment which Cat received at closing, and (pursuant to Section 2.8 of the APA), Earnout Payments which Cat would receive for the next four years following the closing.

*Cat's Employment with LT*

43.     As part of LT's purchase of Cheer's assets, Cat became an LT employee, and Cat signed an employment agreement with CPA, dated March 24, 2021, which contained a four-year term (the "Term") (the "Employment Agreement").

44.     Under the Employment Agreement, Cat held the title of President of CPA.

45.     In that role, Cat's duties were expansive and included "managing day to day operations; entering into contracts on behalf of the Company; hiring, supervising, terminating and determining the compensation and benefits of all Company officers, employees and agents; responsibility for Company property; preparing financial reports, staffing and enhancing and developing the business through management, planning, strategy, sales, marketing, operations, and customer service."

46.     Although Cat was led to believe that Maureen Lippe would be involved in the operations of the Cheer business as a separate unit of LT following the acquisition, shortly after the death of Ms. Lippe's husband just weeks prior to the acquisition of Cheer's assets, to Cat's surprise and disappointment Ms. Lippe ceased having significant involvement in the day-to-day operations of LT's business.

47.     Instead, Cat reported solely to LT's CEO, Paul Dyer, whose support for the acquisition of the Cheer business and operation of the Cheer Business Unit deteriorated over time, if it ever existed in the first place.

48.     As LT's CEO, Dyer had the authority to manage LT's operations.

***LT's Initial Breaches of the APA and Cat's Employment Agreement***

49.     Following LT's acquisition of Cheer's assets, LT failed to transfer Master Service Agreements ("MSAs") for a number of Cheer clients to LT, resulting in the inability of the Cheer Business Unit to perform work for and bill those clients.

50.     Section 6.1 of the APA prohibited LT from taking "any action or inaction intended to limit or reduce the ability of [Cat] to achieve Business Revenue and/or diminish the value of the Earnout Payments" and from "divert[ing] or defer[ring] any sales that could constitute Business Revenue during the earnout period."

51.     During Cat's employment with LT, Dyer allowed another wholly-owned subsidiary of LT called "twelvenote" to compete with the Cheer Business Unit for internal communications and DEI work, even though the APA required that internal communications and DEI work was to be work of the Cheer Business Unit and that revenue from such work be allocated to the Cheer Business Unit.

52.     In June of 2021, Dyer directed Cat to assume internal HR duties, which further hindered Cat's ability to perform billable work.

53.     LT's impeding Cat's ability to perform billable work by assigning her internal HR duties also impacted Cat's ability to achieve the Earnout Payments.

54.     Despite Cat's efforts to hire employees, which would have increased business revenue and thus allowed Cat to get the Earnout Payments under the APA, Dyer surreptitiously hired an applicant for whom the Cheer Business Unit first extended an offer of employment and transferred an employee of the Cheer Business Unit to twelvenote.

55.     On numerous occasions from the fall of 2021 through the end of her employment, Cat advised Dyer and others in LT leadership that LT had violated both the APA and the Employment Agreement by taking the above actions, and other actions further specified below.

56.     For example, Section 2.8 of the APA also required LT, within 30 days after March 24, 2022 (the first anniversary of the closing date), to deliver to Cat a "Performance Statement" (as defined in the APA).

57.     Although LT did was required to deliver to Cat a Performance Statement within 30 days after March 24, 2022, LT did not deliver the Performance Statement.

58.     Section 2.8 of the APA also obligated LT to cooperate with Cat to address any questions she may have had with respect to the calculations set forth in the Performance

Statement, including providing Cat with any requested supporting documentation and allowing her access to LT's books and records in order to verify the calculation of the payouts.

59.     LT refused to cooperate with Cat to address any questions she may have had with respect to the calculations set forth in the Performance Statement, did not provide Cat with any requested supporting documentation, and denied Cat access to LT's books and records in order to verify the calculation of the Earnout Payments.

60.     LT never made a single Earnout Payment to Cat.

*Cat's Cancer Diagnosis*

61.     Cat received devastating news in April 2021:  she had breast cancer.

62.     Cat then underwent a double mastectomy, taking just two weeks off from work from April 20, 2021 through May 5, 2021.

63.     Cat had revision surgery on September 23, 2021, taking just three days off from work.

64.     Cat's billable hours did not decrease following either of her surgeries.

65.     Dyer knew of Cat's breast cancer diagnosis and treatment as of September 2021.

66.     In September 2021, Dyer asked Cat to work on a breast implant pitch for a client and Cat declined to participate.

67.     Cat told Dyer that she was not able to participate in the pitch because she had been diagnosed with breast cancer and had undergone surgery for that condition.

68.      In the weeks following Cat's disclosure of her cancer diagnosis and treatment, LT commenced a process of dismantling the Cheer Business Unit, demoting Cat, steering to twelvenote's Chief Integration Officer (who was not disabled or perceived as such) work that was required by the Employment Agreement and the APA to be allocated to Cheer, and otherwise violating the Employment Agreement and APA as further specified below.

***Comments about Cat's Age***

69.      Cat is 53 years old.

70.      During her employment with LT, Cat was 10 to 20 years older most of the other employees of LT.

71.      During Cat's employment with LT, Dyer and others made derogatory comments about Cat's age.

72.      During a client meeting, one of the client representatives inquired as to who at LT had deep expertise and on-the-ground change management experience; in response, Dyer pointed to Cat and said something like, "Cat, right here, has all the grey hairs, let me pull out her walker."

73.      During the car ride back to the city following that client meeting, Dyer made fun of the font size on Cat's cell phone and another LT manager joined in.

74.      In addition, during Cat's employment with LT, Dyer said that because he is young, he hires "older workers" to make himself look like he knows what he is doing.

***Dyer Treated Cat Differently Because She is a Woman***

75.      As part of her HR duties at LT, Cat performed a pay parity analysis in October 2021.

76.      The pay parity analysis revealed that four men on LT's Leadership Team (a team comprised of eleven individuals) were all paid more than the women on the LT Leadership Team.

77.      On information and belief, three male members of LT's Leadership Team received an annual base salary approximately 33-percent higher than Cat's.

78.     The skill, effort and responsibility required for Cat to perform her job for LT was substantially equal to the skill, effort and responsibility required of these three male members of LT's Leadership Team.

79.     Cat's working conditions at LT were similar to those of these three male members of LT's Leadership Team.

80.     Despite the promise in the APA not to take any action (or inaction) that would limit or reduce Cat's ability to achieve Business Revenue and/or diminish the value of the Earnout Payments, Dyer gave credit for business (which impacted the Earnout Payments) to twelvenote and its Chief Integration Officer that rightfully belonged with the Cheer Business Unit and Cat.

81.     Despite the promise in the APA not to take any action (or inaction) that would limit or reduce Cat's ability to achieve Business Revenue and/or diminish the value of the Earnout Payments, Dyer allowed and encouraged twelvenote and its Chief Integration Officer to compete with the Cheer Business Unit and Cat for employees and business.

82.     Cat's challenges at LT were not unique experiences for female leaders at LT.

83.     For example, not long after terminating Cat's employment, LT terminated the employment of two other female members of the LT Leadership Team.

84.     LT replaced both of these female members of the LT Leadership Team with men.

85.     Cat is also not the first employee to accuse LT of discrimination on the basis of sex.

86.     On information and belief, in the late summer of 2021 Cat became aware that another female Senior Vice President asserted claims of discrimination on the basis of sex against LT.

87.     That female Senior Vice President's employment also was terminated involuntarily, although LT reached a consensual settlement agreement with her to resolve her claims.

***Dyer's Dismantling of Cheer***

88.     On January 10, 2022, Dyer informed Cat that he would be dissolving the Cheer brand in favor of the LT Employee Experience practice.

89.     Dyer also informed Cat that she would be installed in a new role called "President of LT's Employee Experience Practice," a demotion from her previous role as President of CPA.

90.     Although this demotion violated the Employment Agreement, the parties never agreed to any amendment of the Employment Agreement to allow for such a demotion.

91.     Dyer's dissolution of the Cheer brand and the demotion of Cat was a complete shock to Cat and violated both the APA and the Employment Agreement.

92.     Dissolving the Cheer brand and demoting Cat were never discussed even as a remote possibility during acquisition discussions.

93.     Cat repeatedly notified Dyer from January 10, 2022 through June 24, 2022 that LT's actions constituted additional, and new, violations of the APA and the Employment Agreement.

94.     Later in January 2022, Cat and Dyer met to find a path forward.

95.     During the meeting, Dyer told Cat that she was a critical lever to LT's success and asked what it would take to make her stay there.

96.     During the meeting, Dyer suggested that they tear up the APA and enter into a new one and also rip up the Employment Agreement and enter into a new one.

97.     As part of these efforts to make LT more appealing to Cat, Dyer promised to let Cat hire more staff and give her credit for all internal communications work at the company.

12

98.     Even though Cat never said she wanted to leave LT, during the meeting, Dyer told Cat that he would pay her severance if she left—no matter what.

99.     These were empty promises.

100.    For the next few months, Cat attempted to engage Dyer on the hostile manner in which she was being treated at work and the violations of the APA and the Employment Agreement.

101.    For the next few months, Cat also repeatedly asked Dyer for the new Employment Agreement he proposed for her during their meeting.

102.    Dyer never offered a new Employment Agreement to Cat.

103.    On June 9, 2022, Cat told Dyer that she felt it would be best if their attorneys took over any negotiations related to any new employment agreement.

104.    Within 12 hours, Dyer and LT's Chief Financial Officer Marissa McKeon, placed Cat on an involuntary leave of absence, barring her from coming in to the office and/or talking to LT employees and telling her she could have no contact with her clients.

105.    During her involuntary leave, Cat was ostracized, isolated, and barred from pursuing her livelihood.

106.    Cat faced numerous questions as to why she was not actively working at LT, though she could not answer them, because Dyer forbid her from coming in to the office and/or talking to LT employees during her leave.

107.    On June 10, 2022, through her legal counsel, Cat complained to Dyer about discrimination, retaliation, and LT's breaches of the APA and the Employment Agreement.

108.    On June 24, 2022, Cat again complained, through her legal counsel, to Dyer of discrimination, retaliation, and LT's breaches of the APA and the Employment Agreement.

109.    While Cat was on leave because of the investigation, her job duties were transferred to younger, non-disabled and/or male LT employees.

*The Sham "Investigation"*

110.    Dyer told Cat that during her involuntary leave of absence LT would "work with a third party to investigate certain issues related to [her] employment" and that she should cooperate with the investigation so that it could be "completed efficiently."

111.    Cat was never interviewed as part of the alleged investigation, and was barred from contacting current or prospective clients for over two months.

112.    Cat later learned that the "third party" LT engaged to conduct the investigation was Anchin, Block & Anchin LLP.

113.    LT asked Anchin to review and analyze timesheet and invoice data of Cat and the Cheer team and to issue to LT a report summarizing its findings (the "Anchin Report").

114.    On information and belief, the Anchin investigation was not independent.

115.    Rather, on information and belief, the investigation was conducted in response to the directives and parameters established in consultation with LT, and based upon false predicates.

116.    An independent investigation would have included a discussion with the person or Business Unit being investigated, would have ascertained that the responsibility for client invoicing remained entirely in the hands of LT's finance department (not Cat or employees of the Cheer Business Unit) and would have revealed that employees working hours that would not be billed to the client was standard operating procedure for employees of the Cheer Business Unit that was well known to LT and necessary to maintain the level of performance required to maintain the Cheer business for LT.

117.     The Anchin Report—based on cherry picked information —contains several false claims regarding inconsistencies in billing and complaints from clients regarding invoices and attributes those inconsistencies and complaints to Cat and the Cheer business's team.

118.     For example, the Anchin Report criticizes Cat and the Cheer team for having a "significant" amount of non-billable time recorded on their timesheets from April to December 2021 and January to May 2022.

119.     This non-billable time was business development time which LT knew was occurring, and which it understood and accepted, at all times following LT's acquisition of Cheer's business.

120.     Prior to LT's acquisition of the Cheer business, part of the Cheer client service model was to make significant investments of time in client relationships, by sometimes helping out with a phone call free of charge, and by doing what it took to get the job done well (even if that meant not being able to bill the client for this investment of time).

121.     LT's finance department instructed employees of the Cheer Business Unit to record on their timesheets every minute of their time worked on a client account, even if the hours worked resulted in time spent in excess of what the client had agreed upon in its written scope of work ("SOW"), and which, therefore were not to be billed to the client.

122.     LT knew that the Cheer client service model involved spending relatively more non-billable time than LT's other business units spent on their matters.

123.     Despite having such knowledge, LT never notified Cat or the employees of the Cheer Business Unit that LT viewed employees' spending this amount of non-billable time as misconduct meriting termination of Cat's employment for "cause".

124.    As another example, the Anchin Report accused Cat and employees of the Cheer Business Unit of necessitating "significant voided invoices."

125.    As set forth above, LT's finance department assured employees of the Cheer Business Unit that if they recorded time over the amount agreed upon by the client, the finance department would adjust the invoices to be consistent with the SOW prior to billing the client.

126.    The finance department repeatedly failed to make such adjustments, and sent out incorrect invoices to clients, leading to multiple invoice cancellations or reductions in the invoices.

127.    Cat did not see and had no control over LT's invoices before they were sent to clients.

128.    Moreover, while Cheer invoicing practices and procedures included providing clients with detailed bills that described to clients the work that had been done and how long Cheer employees spent doing the work, LT's invoices showed only the amount owed, leading to numerous client questions and dissatisfaction.

129.    Cat had difficulty obtaining additional invoicing details for clients of the Cheer Business Unit, because LT's finance department was unresponsive and/or significantly delayed in responding.

130.    A number of voided invoices described in the Anchin Report were the result of LT's finance department voiding amounts it should never have billed in the first place, and were not the result of the Cheer team billing clients for amounts in excess of the client's agreement as documented in a SOW.

131.    LT's finance department repeatedly engaged in the improper practice of billing clients of the Cheer business for incorrect amounts in violation of written SOWs.

132.    The LT finance department billed for hours worked by employees of the Cheer Business Unit for amounts in excess of the flat monthly amounts or which were capped by overall project budgets, in each case as reflected in written SOWs.

133.    LT knew of and approved of all SOWs at the outset of each project, and the finance department had an obligation to invoice clients consistent with the SOW, absent client approval for a change.

134.    LT voided other invoices even though the client acknowledged that employees of the Cheer business completed the services within the SOW, the client owed payment on some if not all of the amounts reflected on each invoice, and where the client merely had questions about the invoice that it wished to discuss with LT.

*Cat's Wrongful Termination*

135.    On August 15, 2022, Dyer contacted Cat, via email, for the first time since June 10, 2022 and said:  "Please be advised that, as a result of our investigator's findings, we have decided to terminate your employment in line with paragraph 3(b) of your Employment Agreement effective immediately. Please note that all restrictive covenants remain in place."

136.    The "investigator's findings" refers to the Anchin Report.

137.    Dyer's assertion in the August 15, 2022 email that LT decided to terminate Cat's employment "as a result of our investigator's findings" was false, and not a reflection of LT's true reasons for its decision to terminate Cat's employment.

138.    Rather, Dyer's reliance on the Anchin Report was a pretext manufactured by LT to hide its true motivations for terminating Cat's employment.

139.    On information and belief, LT's true reasons for terminating Cat's employment were a mixture of motivations, including, discrimination on the basis of age, sex, and actual or perceived disability, and a desire to retaliate against Cat for (a) Cat's complaints about LT's

discrimination, and (b) Cat's complaints about LT's violations of the Employment Agreement

and the APA.

140.    Section 3(b) of Cat's Employment Agreement stated that LT could terminate

Cat's employment at any time for "cause."

141.    Section 3(b) of Cat's Employment Agreement defines "cause" as:

(i) conviction of, or plea of guilty or nolo contendere, to a crime that constitutes a
felony or a crime that constitutes a misdemeanor involving moral turpitude; (ii)
material violation of the Company or Lippe Taylor's material written policies
(including any codes of conduct, and policies related to discrimination,
harassment or performance of illegal or unethical activities) provided that such
documents are provided to Executive and provided that, where such violation is
curable, Executive is provided thirty (30) days from receipt of written notice of
any material violation to cure such violation; (iii) material breach of any material
provision of this Agreement or the APA, as applicable, and not curing such
breach within thirty (30) days of receipt of written notice of such breach; (iv)
willful engagement in dishonesty, illegal conduct, or gross misconduct, which is,
in each case, materially injurious to the Company or Lippe Taylor or their
Affiliates; (v) intentional conduct that brings or is reasonably likely to bring the
Company or Lippe Taylor significant negative publicity or into significant public
disgrace, embarrassment, or disrepute; and (vi) willful unauthorized disclosure of
material confidential information of the Company or Lippe Taylor or any Affiliate
or subsidiary of the Company or Lippe Taylor.

142.    Under the Employment Agreement, if LT had "cause" to terminate Cat's

employment, she would not be entitled to any severance payments.

143.    Under the terms of the Employment Agreement, if LT terminated Cat's

employment without cause prior to the expiration of the Term, Cat was entitled "Severance

Benefits" calculated as her base salary for the remainder of the Term plus one-year of company-

subsidized COBRA coverage.

144.    LT never paid Cat any Severance Benefits, and it never acknowledged that it

terminated her employment without cause.

145.    LT did not have "cause" to terminate Cat's employment under Section 3(b) of the

Employment Agreement.

146.    On or before August 15, 2022, LT never notified Cat of the grounds supporting its assertion that there existed "cause" to terminate Cat's employment under any of the subparts of Section 3(b) of the Employment Agreement.

147.    On or before August 15, 2022, Cat was never convicted of a crime as required before LT could terminate Cat's employment for "cause" under Section 3(b)(i) of the Employment Agreement.

148.    On or before August 15, 2022, LT never gave Cat the required "written notice of any material violation" of LT's "material written policies," nor did LT give Cat the opportunity to cure any purported violations of such policies within 30 days of receipt of such written notice, in each case as required before LT could terminate Cat's employment for "cause" under Section 3(b)(ii) of the Employment Agreement.

149.    On or before August 15, 2022, LT never gave Cat the required "written notice" of any "material breach" of any "material provision" of the Employment Agreement or the APA, nor did LT give Cat the opportunity to cure any purported material breach within 30 days of receipt of such written notice, in each case as required before LT could terminate Cat's employment for "cause" under Section 3(b)(iii) of the Employment Agreement.

150.    On or before August 15, 2022, Cat never undertook the "willful engagement in dishonesty, illegal conduct, or gross misconduct, which is, in each case, materially injurious" to LT as required before LT could terminate Cat's employment for "cause" under Section 3(b)(iv) of the Employment Agreement.

151.    Specifically, LT's (not Cat's) decision to void certain invoices as specified in the Anchin Report, did not constitute Cat's "engagement in dishonesty, illegal conduct, or gross

misconduct," and certainly not the "willful" engagement in such conduct as those terms are used in Section 3(b)(iv) of the Employment Agreement.

152.    The amounts LT (not Cat) chose to void on LT invoices for work by employees of the Cheer Business Unit as summarized in the Anchin Report were either the product of LT's billing errors or were appropriately voided in the ordinary course of business and consistent with the Cheer Business Unit's and LT's past practice and the SOWs.

153.    Even considering the total amounts voided in the LT invoices as summarized in the Anchin Report, such amounts were not "materially injurious" to LT as that term is used in Section 3(b)(iv) of the Employment Agreement.

154.    However, because all of the amounts voided were either a result of LT's billing errors (and not Cat's), or were appropriately voided consistent with LT's past practice, LT suffered absolutely no "injury" caused by Cat, and any injury from voiding such invoices was entirely self-inflicted by LT.

155.    For the same reasons, on or before August 15, 2022, Cat never engaged in any "intentional conduct that brings or is reasonably likely to bring the Company or Lippe Taylor significant negative publicity or into significant public disgrace, embarrassment, or disrepute" as required before LT could terminate Cat's employment for "cause" under Section 3(b)(v) of the Employment Agreement.

156.    On or before August 15, 2022, no conduct by Cat as described in Section 3(b)(v) of the Employment Agreement was made public by anyone, including Cat.

157.    On or before August 15, 2022, Cat never engaged in "willful unauthorized disclosure of material confidential information" of LT as required before LT could terminate Cat's employment for "cause" under Section 3(b)(vi) of the Employment Agreement.

158.    Because LT did not have "cause" to terminate Cat's employment under Section 3(b) of the Employment Agreement, she was entitled to the Severance Benefits provided for therein.

159.    As provided in Section 3(d) of the Employment Agreement, LT was and remains obligated to pay Cat Severance Benefits in an amount equal to pay her base salary remaining during the remainder of the Term of the Employment Agreement following her termination of employment plus an amount equal to her COBRA premiums for health care coverage for a period of one year.

160.    Thus, LT was and remains obligated to pay Cat an amount equal to her base salary at the rate of $300,000 per year (plus amounts attributable to regular pay increases) from August 15, 2022 through and including March 24, 2025.

161.    LT willfully failed and refused to pay Cat the Severance Benefits to which she is entitled in violation of Section 3(d) of the Employment Agreement and other legal obligations further specified herein.

### *LT's Failure to Pay Cat's Final Wages*

162.    Section 11 of the Employment Agreement states in relevant part:

> **Notices**. All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one Business Day after being sent to the recipient by reputable overnight courier service, *(iii) one Business Day after being sent to the recipient by facsimile transmission with confirmation or electronic mail with record of transmission,* or (iv) four (4) business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the Company at its principal office set forth below and to Executive at the address set forth below.
>
> . . . (Emphasis added).

21

163.     Pursuant to Section 11 of the Employment Agreement, Dyer's August 15, 2022 email termination of Cat's employment did not become effective until August 16, 2022.

164.     LT paid Cat only through August 15, 2022.

***Assignment of Cat's Duties to Younger, Male and/or Non-Disabled Employees***

165.     Following termination of Cat's employment LT continued to operate the business it had previously acquired from Cheer and, therefore, reassigned to other employees the job duties previously performed by Cat.

166.     Following termination of Cat's employment, LT distributed Cat's job responsibilities among twelvenote's Chief Integration Officer (male) and to two LT employees (female).

167.     On information and belief, twelvenote's Chief Integration Officer and the two LT employees were younger than Cat, and in one case more than twenty years younger.

168.     On information and belief, these three employees did not suffer from any actual or perceived disabilities which were previously disclosed to LT.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### BREACH OF CONTRACT
### (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

169.     Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

170.     Cat entered into the Employment Agreement with LT on March 24, 2021.

171.     As set forth herein, LT breached the Employment Agreement, including but not limited to Sections 3(b) (termination "for cause") and 3(d)(entitlement to Severance Benefits).

172.     As an actual and proximate result of LT's breach, Cat has sustained damages to be proved at trial.

## SECOND CAUSE OF ACTION
## VIOLATION OF ARTICLE 6 OF THE N.Y. LABOR LAW § 190, *et seq.*
### (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

173.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

174.    Cat was an employee of LT within the meaning of § 190(2) of the New York Labor Law.

175.    By withholding and refusing to pay Cat's wages and severance owed to her under the Employment Agreement, LT has violated §§ 193 and 198 of the New York Labor Law.

176.    LT had no good faith basis to believe their failing to pay wages was in compliance with the law, for purposes of § 198(1-a) of the New York Labor Law.

177.    As an actual and proximate result of LT's violations, Cat has sustained damages, including liquidated damages in an amount equal to an additional 100% of the monies that LT owes her, as well as her attorney' fees, costs, and disbursements incurred in the prosecution of this action.

## THIRD CAUSE OF ACTION
## BREACH OF CONTRACT
### (BY PLAINTIFF CHEER AGAINST DEFENDANT LT)

178.    Plaintiff Cheer alleges and incorporates by reference the allegations in the preceding paragraphs.

179.    Cheer entered into the APA with LT on March 24, 2021.

180.    As set forth herein, LT breached the APA, including but not limited to Section 2.8 (payment of Earnout Payments, the provision of a Performance Statement on a certain timeline, and cooperation regarding both), and Section 6.1 (taking action or inaction intended to limit or reduce Cat's ability to achieve Business Revenue and/or diminish the value of the Earnout Payments and diverting sales that could constitute Business Revenue during the earnout period).

181.    As an actual and proximate result of LT's breach, Cheer has sustained damages to be proved at trial.

### FOURTH CAUSE OF ACTION
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

182.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

183.    The Employment Agreement referenced herein contains an implied covenant of good faith and fair dealing.

184.    LT as Cat's employer agreed to perform the terms of the Employment Agreement.

185.    The Employment Agreement's implied covenant of good faith and fair dealing prohibits LT from doing anything to prevent Cat from receiving the benefits and entitlements of the Employment Agreement.

186.    LT breached its duty of good faith and fair dealing with regard to Cat's Employment Agreement.

187.    As an actual and proximate result of LT's breach, Cat has sustained damages to be proved at trial.

### FIFTH CAUSE OF ACTION
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (BY PLAINTIFF CHEER AGAINST DEFENDANT LT)

188.    Plaintiff Cheer alleges and incorporates by reference the allegations in the preceding paragraphs.

189.    The APA referenced herein contains an implied covenant of good faith and fair dealing.

190.    LT agreed to perform the terms of the APA.

191.    The APA's implied covenant of good faith and fair dealing prohibits LT from doing anything to prevent Cheer from receiving the benefits and entitlements of the APA.

192.    LT breached its duty of good faith and fair dealing with regard to the APA.

193.    As an actual and proximate result of LT's breach, Cheer has sustained damages to be proved at trial.

**SIXTH CAUSE OF ACTION**
**VIOLATION OF TITLE VII –SEX DISCRIMINATION**
**(BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)**

194.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

195.    At all relevant times hereto, Cat was an "employee" within the meaning of Title VII, and LT was an "employer" within the meaning of Title VII.

196.    As outlined above, LT violated Title VII when it discriminated against Cat.

197.    LT is liable for sex discrimination against Cat because the unlawful conduct was carried out by Dyer, who managed LT and had the sole and exclusive authority to manage LT and to do any and all acts necessary or convenient for such purpose.

198.    As a direct and proximate result of LT's discriminatory conduct based on Cat's sex in violation of Title VII, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

199.    LT's unlawful actions constitute bad faith, malicious, willful, and wanton

violations of Cat's federally protected rights, for which she is entitled to an award of punitive

damages.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF TITLE VII – RETALIATION**
**(BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)**

200.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in

the preceding paragraphs.

201.    At all relevant times hereto, Cat was an "employee" within the meaning of Title

VII, and LT was an "employer" within the meaning of Title VII.

202.    Cat engaged in protected activity when she complained about the way she was

being treated as an LT employee, when she engaged legal counsel to represent her, and when her

legal counsel reported discrimination and retaliation to LT on Cat's behalf.

203.    LT retaliated against Cat by launching an "investigation" into her, placing her on

leave, barring her from contacting clients or employees, and falsely terminating her "for cause."

204.    LT's retaliated against Cat, in whole or in part, because Cat engaged in protected

activity.

205.    As a direct and proximate result of LT's retaliatory conduct in violation of Title

VII, Cat has suffered, and continues to suffer, monetary and/or economic damages, including,

but not limited to, loss of past and future income, compensation, and benefits, as well severe

mental anguish and emotional distress, including, but not limited to, depression, humiliation,

embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and

suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

206.    LT's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Cat's federally protected rights, for which she is entitled to an award of punitive damages.

### EIGHTH CAUSE OF ACTION
### VIOLATION OF THE ADEA – AGE DISCRIMINATION
### (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

207.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

208.    At all relevant times hereto, Cat was an "employee" within the meaning of the ADEA, and LT was an "employer" within the meaning of the ADEA.

209.    As outlined above, LT violated the ADEA by discriminating against Cat on the basis of her age.

210.    As a direct and proximate result of LT's discriminatory conduct in violation of the ADEA, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

211.    LT's unlawful actions constitute a willful violation of the ADEA for which Cat is entitled to liquidated damages.

### NINTH CAUSE OF ACTION
### VIOLATION OF THE ADEA – RETALIATION
### (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

212.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

213.    Cat engaged in protected activity when she complained about the way she was being treated as an LT employee, when she engaged legal counsel to represent her, and when her legal counsel reported discrimination and retaliation on Cat's behalf.

214.    LT retaliated against Cat by launching an "investigation" into her, placing her on leave, barring her from contacting clients or employees, and falsely terminating her "for cause."

215.    LT's retaliation against Cat was motivated, in whole or in part, because Cat engaged in protected activity.

216.    As a direct and proximate result of LT's retaliatory conduct in violation of the ADEA, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

217.    LT's unlawful actions constitute a willful violation of the ADEA for which Cat is entitled to liquidated damages.

**TENTH CAUSE OF ACTION**
**VIOLATION OF THE ADA – DISABILITY DISCRIMINATION**
**(BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)**

218.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

219.    At all relevant times hereto, Cat was an "employee" within the meaning of the ADA, and LT was an "employer" within the meaning of the ADA.

220.    Cat was diagnosed with breast cancer and received treatment.

221.    Cancer is a physical impairment that substantially limits one or more major life activities, including but not limited to normal cell growth

222.    Cat is disabled because breast cancer, even in remission, is a disability under the ADA.

223.    In addition to or in the alternative, Cat has a record of being disabled under the ADA because she was diagnosed with breast cancer and received treatment.

224.    In addition to or in the alternative, LT perceived Cat as being disabled under the ADA because she was diagnosed with breast cancer and received treatment.

225.    As outlined above, LT violated the ADA by discriminating against Cat on the basis of her actual disability, record of a disability, and/or perceived disability.

226.    As a direct and proximate result of LT's discriminatory conduct in violation of the ADA, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

227.    LT's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Cat's federally protected rights, for which she is entitled to an award of punitive damages.

## ELEVENTH CAUSE OF ACTION
## VIOLATION OF THE ADA – RETALIATION
## (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

228.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

229.    At all relevant times hereto, Cat was an "employee" within the meaning of the ADA, and LT was an "employer" within the meaning of the ADA.

230.   Cat was diagnosed with breast cancer and received treatment.

231.   Cancer is a physical impairment that substantially limits one or more major life activities, including but not limited to normal cell growth

232.   Cat is disabled because breast cancer, even in remission, is disability under the ADA.

233.   In addition to or in the alternative, Cat has a record of being disabled under the ADA because she was diagnosed with breast cancer and received treatment.

234.   In addition to or in the alternative, LT perceived Cat as being disabled under the ADA because she was diagnosed with breast cancer and received treatment.

235.   Cat engaged in protected activity when she complained about the way she was being treated as an LT employee, when she engaged legal counsel to represent her, and when her legal counsel reported discrimination and retaliation on Cat's behalf.

236.   LT retaliated against Cat by launching an "investigation" into her, placing her on leave, barring her from contacting clients or employees, and falsely terminating her "for cause."

237.   LT's retaliation against Cat was because Cat engaged in protected activity.

238.   As a direct and proximate result of LT's retaliatory conduct in violation of the ADA, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

239.     LT's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Cat's federally protected rights, for which she is entitled to an award of punitive damages.

**TWELFTH CAUSE OF ACTION**
**VIOLATION OF THE NYSHRL - SEX DISCRIMINATION AND HOSTILE**
**WORK ENVIRONMENT BASED ON SEX**
**(BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)**

240.     Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

241.     At all relevant times hereto, Cat was an "employee" within the meaning of the NYSHRL, and LT was an "employer" within the meaning of the NYSHRL.

242.     As outlined above, LT violated NYSHRL when it discriminated against Cat and subjected her to a hostile work environment on the basis of her sex.

243.     As a direct and proximate result of LT's discriminatory conduct and the creation and maintenance of a hostile work environment based on Cat's sex in violation of NYSHRL, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

244.     LT's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Cat's rights protected by state law, for which she is entitled to an award of punitive damages.

## THIRTEENTH CAUSE OF ACTION
## VIOLATION OF THE NYSHRL - AGE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT BASED ON AGE
## (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

245.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

246.    At all relevant times hereto, Cat was an "employee" within the meaning of the NYSHRL, and LT was an "employer" within the meaning of the NYSHRL.

247.    As outlined above, LT violated NYSHRL when it discriminated against Cat and subjected her to a hostile work environment on the basis of her age.

248.    As a direct and proximate result of LT's discriminatory conduct and the creation and maintenance of a hostile work environment based on Cat's age in violation of NYSHRL, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

249.    LT's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Cat's rights protected by state law, for which she is entitled to an award of punitive damages.

## FOURTEENTH CAUSE OF ACTION
## VIOLATION OF THE NYSHRL - DISABILITY DISCRIMINATION AND HOSTILE WORK ENVIRONMENT BASED ON DISABILITY
## (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

250.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

251.    At all relevant times hereto, Cat was an "employee" within the meaning of the NYSHRL, and LT was an "employer" within the meaning of the NYSHRL.

252.    Cat was diagnosed with breast cancer and received treatment.

253.    Cancer is a physical impairment that substantially limits one or more major life activities, including but not limited to normal cell growth

254.    Cat is disabled because breast cancer, even in remission, is disability under the NYSHRL.

255.    In addition to or in the alternative, Cat has a record of being disabled under the NYSHRL because she was diagnosed with breast cancer and received treatment.

256.    In addition to or in the alternative, LT perceived Cat as being disabled under the NYSHRL because she was diagnosed with breast cancer and received treatment.

257.    As outlined above, LT violated NYSHRL when it discriminated against Cat and subjected her to a hostile work environment on the basis of her disability.

258.    As a direct and proximate result of LT's discriminatory conduct and the creation and maintenance of a hostile work environment based on Cat's disability in violation of NYSHRL, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

259.     LT's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Cat's rights protected by state law, for which she is entitled to an award of punitive damages.

## FIFTEENTH CAUSE OF ACTION
## VIOLATION OF THE NYSHRL – RETALIATION
## (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

260.     Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

261.     At all relevant times hereto, Cat was an "employee" within the meaning of the NYSHRL, and LT was an "employer" within the meaning of the NYSHRL.

262.     Cat engaged in protected activity when she complained about the way she was being treated as an LT employee, when she engaged legal counsel to represent her, and when her legal counsel reported discrimination and retaliation on Cat's behalf.

263.     LT retaliated against Cat by launching an "investigation" into her, placing her on leave, barring her from contacting clients or employees, and falsely terminating her "for cause."

264.     LT's retaliation against Cat was because Cat engaged in protected activity.

265.     As a direct and proximate result of LT's retaliatory conduct in violation of NYSHRL, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

266.    LT's unlawful actions constitute bad faith, malicious, willful, and wanton violations of Cat's rights protected by state law, for which she is entitled to an award of punitive damages.

### SIXTEENTH CAUSE OF ACTION
### VIOLATION OF THE NYCHRL - SEX DISCRIMINATION AND HOSTILE WORK ENVIRONMENT BASED ON SEX
### (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

267.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

268.    At all relevant times hereto, Cat was an "employee" within the meaning of the NYSHRL, and LT was an "employer" within the meaning of the NYCHRL.

269.    As outlined above, LT violated NYCHRL when it discriminated against Cat and subjected her to a hostile work environment on the basis of her sex.

270.    As a direct and proximate result of LT's discriminatory conduct and the creation and maintenance of a hostile work environment based on Cat's sex in violation of NYCHRL, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

271.    LT's unlawful actions constitute willful or wanton negligence, or recklessness, or demonstrate a conscious disregard of the rights of others, or conduct that is so reckless as to amount to such disregard, for which Cat is entitled to an award of punitive damages.

## SEVENTEENTH CAUSE OF ACTION
## VIOLATION OF THE NYCSHRL - AGE DISCRIMINATION AND HOSTILE WORK ENVIRONMENT BASED ON AGE
## (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

272.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

273.    At all relevant times hereto, Cat was an "employee" within the meaning of the NYCHRL, and LT was an "employer" within the meaning of the NYCHRL.

274.    As outlined above, LT violated NYCHRL when it discriminated against Cat and subjected her to a hostile work environment on the basis of her age.

275.    As a direct and proximate result of LT's discriminatory conduct and the creation and maintenance of a hostile work environment based on Cat's age in violation of NYCHRL, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

276.    LT's unlawful actions constitute willful or wanton negligence, or recklessness, or demonstrate a conscious disregard of the rights of others, or conduct that is so reckless as to amount to such disregard, for which Cat is entitled to an award of punitive damages.

## EIGHTEENTH CAUSE OF ACTION
## VIOLATION OF THE NYCHRL - DISABILITY DISCRIMINATION AND HOSTILE WORK ENVIRONMENT BASED ON DISABILITY
## (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

277.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

278.    At all relevant times hereto, Cat was an "employee" within the meaning of the NYCHRL, and LT was an "employer" within the meaning of the NYCHRL.

279.    Cat was diagnosed with breast cancer and received treatment.

280.    Cancer is a physical impairment that substantially limits one or more major life activities, including but not limited to normal cell growth

281.    Cat is disabled because breast cancer, even in remission, is disability under the NYCHRL.

282.    In addition to or in the alternative, Cat has a record of being disabled under the NYCHRL because she was diagnosed with breast cancer and received treatment.

283.    In addition to or in the alternative, LT perceived Cat as being disabled under the NYCHRL because she was diagnosed with breast cancer and received treatment.

284.    As outlined above, LT violated NYCHRL when it discriminated against Cat and subjected her to a hostile work environment on the basis of her disability.

285.    As a direct and proximate result of LT's discriminatory conduct and the creation and maintenance of a hostile work environment based on Cat's disability in violation of NYCHRL, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

286.    LT's unlawful actions constitute willful or wanton negligence, or recklessness, or demonstrate a conscious disregard of the rights of others, or conduct that is so reckless as to amount to such disregard, for which Cat is entitled to an award of punitive damages.

<strong>NINETEENTH CAUSE OF ACTION<br>VIOLATION OF THE NYCHRL – RETALIATION<br>(BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)</strong>

287.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

288.    At all relevant times hereto, Cat was an "employee" within the meaning of the NYCHRL, and LT was an "employer" within the meaning of the NYCHRL.

289.    Cat engaged in protected activity when she complained about the way she was being treated as an LT employee, when she engaged legal counsel to represent her, and when her legal counsel reported discrimination and retaliation on Cat's behalf.

290.    LT retaliated against Cat by launching an "investigation" into her, placing her on leave, barring her from contacting clients or employees, and falsely terminating her "for cause."

291.    LT's retaliation against Cat was because Cat engaged in protected activity.

292.    As a direct and proximate result of LT's retaliatory conduct in violation of NYCHRL, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

293.    LT's unlawful actions constitute willful or wanton negligence, or recklessness, or demonstrate a conscious disregard of the rights of others, or conduct that is so reckless as to amount to such disregard, for which Cat is entitled to an award of punitive damages.

## TWENTIETH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE
## (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

294.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

295.    At the time LT acquired Cheer, Cat had a business relationship with a number of clients through her work with Cheer.

296.    Defendants had knowledge of Cat's business relationship with Cheer clients.

297.    Defendants intentionally interfered with Cat's business relationship with a number of her Cheer clients, including but not limited to by not transferring MSAs, closing-out clients, eliminating the Cheer brand, and providing invoices to clients that were not up to industry standards.

298.    Defendants' intentional interference with Cat's business relationship with Cheer clients was motivated by malice.

299.    As a result of Defendants' aforementioned malicious and improper conduct, Cat suffered damages, including but not limited to the loss of business relationships with Cheer clients.

## TWENTY-FIRST CAUSE OF ACTION
## VIOLATIONS OF THE EQUAL PAY ACT
## (BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)

300.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

301.   At all times relevant to this action, Cat was employed by LT within the meaning of the Fair Labor Standards Act 29 U.S.C. §§ 201 et seq., ("FLSA") as amended to include the Equal Pay Act, 29 U.S.C. §§ 206(d) et seq.

302.   At all times relevant to this action, LT was an employer within the meaning of the FLSA and the Equal Pay Act.

303.   The acts, practices and policies of LT, as set forth above, constitute discrimination against Cat, in violation of the FLSA and the Equal Pay Act, by unlawfully paying Cat less than male employees for equal work.

304.   LT was aware of complaints made by Cat concerning LT's unfair pay practices, but did not rectify or investigate its unlawful pay practices, and instead retaliated against Cat for her complaints.

305.   LT's violations of the Equal Pay Act resulted in damages to be proven at trial.

306.   LT's violations of the Equal Pay Act were willful and/or reckless, entitling plaintiff to liquidated damages available under the FLSA and the Equal Pay Act.

**TWENTY-SECOND CAUSE OF ACTION**
**VIOLATION OF THE NEW YORK STATE EQUAL PAY ACT**
**(BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)**

307.   Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

308.   At all times relevant to this action, plaintiff was employed by defendants within the meaning of Article 6 of the New York Labor Law §§ 190, *et seq.*

309.   LT violated the right of Cat to be paid the same as male employees performing equal work, in violation of New York Labor Law § 194.

310.    The acts, practices and policies of LT, as set forth above, constitute discrimination against plaintiff, in violation of the New York State Equal Pay Act, N.Y. Labor Law § 194, *et seq.*

311.    Upon information and belief, LT was aware of complaints by Cat concerning LT's unfair pay practices, but did not rectify or investigate its unlawful pay practices, and retaliated against Cat for making the complaints.

312.    LT's violations of the New York Labor Law §§ 194, *et seq.*, were therefore willful within the meaning of N.Y. Labor Law § 198, entitling Cat to liquidated damages.

313.    LT's violations of New York Labor Law §§ 194, *et seq.*, resulted in damages to be proven at trial.

<u>**TWENTY-THIRD CAUSE OF ACTION**</u>
<u>**VIOLATION OF NEW YORK LABOR LAW § 740**</u>
**(BY PLAINTIFF COLELLA-GRAHAM AGAINST DEFENDANT LT)**

314.    Plaintiff Colella-Graham alleges and incorporates by reference the allegations in the preceding paragraphs.

315.    Cat is an "employee" within the meaning of New York Lab. Law § 740(1)(a).

316.    LT is an "employer" within the meaning of New York Lab. Law § 740(1)(b).

317.    Dyer is a "supervisor" within the meaning of New York Lab. Law § 740(1)(f).

318.    When Cat complained to Dyer regarding LT's violations of the Employment Agreement and the APA, and subsequently through her legal counsel on June 10, 2022, and June 24, 2022 regarding discrimination and retaliation, and through other communications described in this Complaint, she complained to a supervisor about LT's violations of a "law, rule, or regulation" within the meaning of New York Lab. Law §§ 740(1)(c) and (2)(a).

319.    LT took "retaliatory action" against Cat within the meaning of New York Lab. Law § 740(e), including, but not limited to, by diminishing her authority as an employee of LT,

interfering with her ability to receive the earn out payments under the APA, by engaging Anchin, Block & Anchin LLP to investigate Cat, by failing to give notice of its intent to terminate Cat's employment and the grounds for such termination, and ultimately by terminating Cat's employment.

320.    As a direct and proximate result of LT's retaliatory conduct in violation of New York Lab. Law § 740, Cat has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of damages, attorney's fees, and costs.

321.    LT's unlawful actions constitute willful or wanton negligence, or recklessness, or demonstrate a conscious disregard of the rights of others, or conduct that is so reckless as to amount to such disregard, for which Cat is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Colella-Graham and Cheer respectfully pray that this Court enter judgment in her favor against Defendants as set forth above and order the following relief:

A.    Declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.    Declaratory judgment that LT did not have "cause" to terminate Cat under the Employment Agreement.

C.    An injunction and order permanently restraining Defendants from engaging in unlawful conduct;

D.      An order directing Defendants to reinstate Plaintiff with a reinstatement of full fringe benefits and seniority rights, or, in the alternative, place her in the position she would have occupied but for LT's discriminatory, retaliatory, and/or otherwise unlawful treatment, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Plaintiff;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security, and other benefits of employment;

F.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs for harm to Plaintiffs' professional and personal reputation and loss of career fulfillment;

G.      An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

H.      An award of punitive and/or liquidated damages against Defendants as allowed by law;

I.      An award of costs that Plaintiffs have incurred in this action as permitted by law, as well as Plaintiffs reasonable attorney's fees to the fullest extent and as permitted by law;

J.      A civil penalty of an amount not to exceed $10,000 pursuant to New York Lab. Law § 740; and

K.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims so triable.


Dated: August 10, 2023                              Respectfully submitted,


                                                    /s/ Nicholas Pappas
                                                    Nicholas Pappas
                                                    Melissa Raphan (*pro hac vice motion*
                                                    *forthcoming*)
                                                    DORSEY & WHITNEY LLP
                                                    51 West 52nd Street
                                                    New York, New York 10019
                                                    (212) 415-9200

                                                    *Attorneys for Plaintiffs Cathleen Colella-Graham*
                                                    *and CCG Partners LLC*